**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSE NEGRETE,<br><br>  Plaintiff,<br><br>  v.<br><br>MIN MIN HLAING,<br><br>  Defendant. | No. 2:19-CV-1653-WBS-DMC-P<br><br>FINDINGS AND RECOMMENDATIONS |

Plaintiff, a prisoner proceeding pro se, brings this civil rights action pursuant to 42 U.S.C. § 1983. Pending before the Court is Defendant's motion for summary judgment, ECF No. 44, Plaintiff's opposition, ECF No. 57, and Defendant's reply, ECF No. 58. Defendant, who was Plaintiff's primary care physician, argues that Plaintiff is not entitled to relief on his deliberate indifference claim because it is based on nothing more than a disagreement of medical opinion, and he provided Plaintiff with adequate medical care. ECF No. 44-2 at 11-12. In addition, Defendant contends that he is entitled to qualified immunity. Id. at 13. The undersigned agrees that there is no genuine dispute about whether Defendant was deliberately indifferent and thus recommends that Defendant's motion for summary judgment be granted.

///

///

///

# I. BACKGROUND

Plaintiff commenced this civil rights action on August 26, 2019.  See ECF No. 1.  Plaintiff's claim is premised on the medical treatment he received from Defendant over the course of two months.  Id. at 2-5.  Specifically, Plaintiff alleges that that Defendant violated his Eighth Amendment right against cruel and unusual punishment by denying him a cane and mobility-impaired vest.  Id. at 4-6.

# II. THE PARTIES' EVIDENCE

## A.   **Defendant's Evidence**

Defendant's motion for summary judgment is supported by declarations of Defendant, ECF No. 44-5, and Joanne Chen, a Deputy Attorney General employed by the Office of the Attorney General for the State of California and Defendant's counsel, ECF No. 44-4, as well as portions of the transcript of Plaintiff's deposition, id. at 4-16.  Defendant also submitted a Statement of Undisputed Facts, ECF No. 44-3, contending the following facts are undisputed:

> 1.   Plaintiff, Jose Negrete (CDCR No. K34346), is an inmate of the California Department of Corrections and Rehabilitation (CDCR) and incarcerated at California State Prison, Sacramento (SAC) since December 20, 2018.  ECF No. 1; Hlaing Decl. ¶ 4.
>
> 2.   Hlaing has been a licensed and practicing physician since July 3, 2008 is board certified in Internal Medicine and Hospice and Palliative Care.  Hlaing Decl. ¶ 2.
>
> 3.   Before Plaintiff became Hlaing's patient, he was not approved for a permanent chrono for a cane or wheelchair.  Hlaing Decl. ¶ 5.
>
> 4.   Hlaing was assigned as Plaintiff's primary care provider for three months, between January 2019 and March 20, 2019.  Hlaing Decl. ¶ 3.
>
> 5.   Within this period of time, Plaintiff saw Hlaing on four occasions: January 2, 2019, January 7, 2019, February 4, 2019, and February 25, 2019.  Hlaing Decl. ¶ 3.
>
> 6.   On the first visit, January 2, 2019, Hlaing saw Plaintiff according to his chronic care plan and in regard to his complaint about suffering a ground-level fall, experiencing pain in his right knee and whole-body.  Plaintiff described his whole-body pain as being on a 10/10 level.  Hlaing Decl. ¶ 4, Ex. A.

7. During that visit, Hlaing saw that Plaintiff was already approved for various durable medical equipment such as a right knee brace, a back brace, and orthopedic shoes, and observed Plaintiff walking, albeit walking with a limp and knee brace. Hlaing Decl. ¶¶ 5-6.

8. Plaintiff had been formerly prescribed Lyrica, a pain medication, by a prior PCP and that prescription was discontinued before he met with Hlaing. Hlaing Decl. ¶ 5.

9. Plaintiff requested a wheelchair or a cane, and strongly demanded that he be placed back on Lyrica because of his worsening nerve pain. Hlaing Decl. ¶ 6.

10. Lyrica is a non-formulary medication and, as such, California Correctional Health Care Services (CCHCS) policy does not allow for non-formulary medications to be prescribed without justification. Hlaing reviewed Plaintiff's medical [f]ile and noted that his prior PCP had found no clinical indication for Lyrica for nerve pain. Hlaing Decl. ¶ 6.

11. If a patient asks for a cane, Hlaing does a multi-step evaluation to assess whether a cane would be medically indicated and supportive of treatment. Hlaing Decl. ¶ 7.

12. This evaluation includes a review of patient's history and severity of any recent trauma to the back and lower extremities, and a physical evaluation of the patient's back and lower extremities. Hlaing Decl. ¶ 7.

13. If the injuries are not apparent, or the traumatic events occurred less-than recently, Hlaing may secondarily need to obtain more information through radiological imaging, such as a CT scan or x-ray scan. Hlaing Decl. ¶ 7.

14. Assuming that this evaluation does not show that a cane would be supportive of a patient's treatment, Hlaing will also rely on the recommendations of the patient's physical therapist. Hlaing Decl. ¶ 7.

15. Most patients who report mobility issues, or related pain concerns, generally benefit from some measure of physical therapy. Hlaing Decl. ¶ 7.

16. Most patients who report mobility issues, or related pain concerns, generally benefit from some measure of physical therapy. Hlaing Decl. ¶ 7.

17. Hlaing noticed that Plaintiff's right knee was slightly swollen and he had excruciating tenderness in his lower back to minimal touching and several parts of his body. Hlaing asked about any events of trauma in addition to his fall. Hlaing Decl. ¶ 8.

18. Plaintiff informed Hlaing that he had been in a serious motor vehicle accident in 1991, to which he had been in a coma and needed left wrist surgery and knee surgery. Hlaing Decl. ¶ 8.

3

19. Hlaing noted that Plaintiff's previous PCP had requested an MRI scan of the lumbar spine but that this request had been denied by Plaintiff's previous institution. Hlaing Decl. ¶ 8.

20. Hlaing also ruled out radiculopathy, and noted that Plaintiff's obesity contributes to his knee pain and back pain to some extent. Hlaing Decl. ¶ 9.

21. Plaintiff's complaint of intensive wholebody pain were more suggestive of fibromyalgia to Hlaing. Hlaing Decl. ¶ 9.

22. He reviewed Plaintiff's prior PCP's notes that found no medical indication for Lyrica, and additionally noted that he needed to conduct another follow-up evaluation for an appropriate diagnosis of Plaintiff's pain complaints. Hlaing Decl. ¶ 9.

23. Hlaing documented in his progress note that if a fibromyalgia diagnosis is established that formulary medications, such as tricyclics, should be prescribed. Hlaing Decl. ¶ 9.

24. Hlaing reviewed Plaintiff's October 23, 2018 x-ray and decided he needed more information to reach an appropriate diagnosis. Hlaing ordered new x-ray imaging to be conducted on Plaintiff's lower spine and right knee and scheduled another visit to review the x-ray images with him. Hlaing Decl. ¶ 8, Exs. A-B.

25. Hlaing did not find any medical indication for a cane or wheelchair because he needed to conduct follow-up evaluations, including x-ray imaging, for further information. Hlaing Decl. ¶ 9, Exs. A-B.

26. Hlaing prescribed pain cream in addition to the Tylenol and Ibuprofen that Plaintiff was already was approved for. Hlaing also noted that Plaintiff was already using a knee brace at the time of this appointment. Hlaing Decl. ¶ 9, Ex. A.

27. Hlaing saw Plaintiff a second time on January 9, 2019, to go over his x-ray findings. Plaintiff had multiple requests for specific types of treatment, such as needing new glasses, stronger pain medication, among other things, and his primary complaints were about his persistent whole-body and knee pain. Hlaing Decl. ¶ 10, Ex. C.

28. Hlaing conducted another physical examination of Plaintiff and reviewed his updated x-ray scans with him, which included his evaluation that Plaintiff had no new fractures, dislocations, or any acute findings in his lumbar spine or knee. Hlaing Decl. ¶ 10, Ex. C.

29. Hlaing reviewed the x-ray's seven views of Plaintiff's spine, and found mild degenerative changes of his lumbar spine that would not have affected his ability to walk or freely move. Hlaing Decl. ¶ 10.

30. Hlaing found Plaintiff's spine alignment was normal throughout flexion and extension and Plaintiff was able to move and bend his spine without abnormality. Hlaing Dec. ¶ 10.

///

4

31. Hlaing found an age-indeterminate T-10 compression fracture, essentially, a previous fracture that would have posed minimal interference with Plaintiff's ability to walk or otherwise ambulate. Hlaing Decl. ¶ 10.

32. Hlaing did not consider this compression fracture to pose any impediment to Plaintiff's ability to move his spine, or ambulate, particularly as the multiple x-ray images had indicated he could, in fact, move his spine normally. Hlaing Dec. ¶ 10.

33. Hlaing did not find any lumbar fracture or subluxation, and the visualized portions of his sacroiliac joints were unremarkable. Hlaing Decl. ¶ 10.

34. Hlaing did find mild spurring in Plaintiff's right knee, but not to a degree that would have compromised Plaintiff's ability to move his knee or ambulate generally. Hlaing Decl. ¶ 10.

35. Hlaing offered a steroid injection for Plaintiff's knee to help with possible inflammation or swelling that he associated with the mild spurring in his knee, which Plaintiff declined. Hlaing Decl. ¶ 10, Ex. C.

36. Hlaing attributed Plaintiff's whole-body pain to possible fibromyalgia and prescribed Lyrica (after Amitriptyline, a tricyclide, was found to be incompatible with Plaintiff's psychiatric medication) and Duloxetine. Hlaing Decl. ¶ 11, Ex. C.

37 Based on these evaluations and the x-ray images, Hlaing recommended physical therapy as the best course of treatment for Plaintiff. Hlaing Decl. ¶ 11.

38. It was important that Plaintiff remain mobile and maintain his ability to move and ambulate, which could be accomplished by physical therapy rather than a simple prescription of a cane[.] Hlaing Decl. ¶ 11.

39. Hlaing referred Plaintiff to physical therapy and explained to him the importance of attending physical therapy to help him regain and maintain all degrees of long-term mobility, even when Plaintiff expressed reluctance. Hlaing Decl. ¶ 11.

40. The Lyrica and Duloxetine were additionally meant to help Plaintiff manage his knee pain to enable his participation in physical therapy while balancing his mental health treatment needs. Hlaing Decl. ¶ 11.

41. That same day, Hlaing referred Plaintiff to an optometrist for his glasses. Hlaing Decl. ¶ 11.

42. Hlaing saw Plaintiff for a third time on February 4, 2019, during which Plaintiff's chief complaints were about pain and increasing his Lyrica dosage. Hlaing Decl. ¶ 12, Ex. D.

///

43. Hlaing conducted a co-consult with a registered nurse and agreed to increase Plaintiff's Lyrica based on Plaintiff's fibromyalgia pain not being controlled.  Hlaing Decl. ¶ 12, Ex. D.

44. Hlaing saw Plaintiff at a fourth, and final, appointment on February 25, 2019, after receiving notification that Plaintiff had been refusing to participate in physical therapy.  Hlaing Decl. ¶ 13, Ex. E.

45. At this appointment, Plaintiff informed Hlaing that he had been refusing to participate in physical therapy because of persistent and severe whole body pain, which he described on a 10/10 level, and asked to have his Lyrica dosage increased.  Hlaing Decl. ¶ 13, Ex. E.

46. Hlaing conducted a physical evaluation of Plaintiff, including a straight-leg test to determine whether Plaintiff's back pain was attributable to nerve root sensitivity, which was negative and no such symptoms were found.  Hlaing Decl. ¶ 13, Ex. E.

47. Hlaing also noted that Plaintiff was walking without the assistance of a cane, and he was ambulating well with his knee brace.  Hlaing Decl. ¶ 13.

48. To address Plaintiff's persistent pain Hlaing increased Plaintiff's Lyrica dosage again and advised him of the importance of participating in physical therapy.  Hlaing Decl. ¶ 13.

49. There was no medical indication for a cane at the time of Plaintiff's last appointment with Hlaing, given his recent physical evaluations, his ability to walk without a cane, his x-ray imaging, and his apparent refusal to participate in physical therapy.  Hlaing Decl. ¶ 13.

50. Hlaing's goals in providing these treatments during all four visits was to address Plaintiff's both short-term and long-term medical needs posed by his chronic pain and mobility difficulties, while balancing his mental health needs.  Hlaing Decl. ¶ 14.

51. Hlaing's clinical judgment was that it was more appropriate to refer Plaintiff to physical therapy for rehabilitation and treatment of his whole-body pain, his mobility concerns, and to benefit his obesity.  Hlaing Decl. ¶¶ 14-15.

52. Hlaing's prescription of Lyrica and other pain medication for Plaintiff was for the additional purpose of helping Plaintiff's participation in physical therapy and rehabilitation, while balancing his mental health treatment needs.  Hlaing Decl. ¶ 14.

53. Based on clinical judgment at each of his four appointments with Plaintiff, Hlaing found no clinical indication for a cane or wheelchair.  Hlaing Decl. ¶ 15.

54. A mobility vest would not have been a mode of treatment for Plaintiff's medical concerns because they do not offer any pain alleviation or bracing or supportive function.  Hlaing Decl. ¶ 16.

///

   55. A mobility vest is merely a traffic vest, which provides a visual alert to staff that a mobility-impaired inmate cannot obey standard alarm commands to "get down" during yard incidents. Hlaing Decl. ¶ 16.

   56. Plaintiff's medical case did not support a provision of a mobility vest in any case, because Hlaing had no reason to believe that Plaintiff could not obey a "get down" order from correctional staff. Hlaing Decl. ¶ 16.

   57. Hlaing is not a member of SAC's Reasonable Accommodation Panel (RAP) and has never attended meetings where Plaintiff's RAP requests were reviewed. Hlaing Decl. ¶ 17.

   58. As such, Hlaing did not issue any response to any of Plaintiff's requests for reasonable accommodation presented at SAC's RAP, including a February 1, 2019 request for a mobility vest or cane. Hlaing Decl. ¶ 17.

ECF No. 44-3.

### B. **Plaintiff's Evidence**

In response to Defendant's Statement of Undisputed Facts, Plaintiff filed a Statement of Disputed Facts asserting genuine issues of disputed fact. See ECF No. 57. In support of his opposition, Plaintiff offers his own declaration signed under penalty of perjury, see id. at 8-10, as well as the following exhibits:

  Exhibit 1  Defendant's declaration, id. at 17.

  Exhibit A-2 Defendant's memorandum of points and authorities in support of Defendant's motion for summary judgment, id. at 25.

  Exhibit A-3 Defendant's statement of undisputed facts in support of motion for summary judgment, id. at 39.

Because Plaintiff is pro se, the Court "must consider as evidence in his opposition to summary judgment all of [the] contentions offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [Plaintiff] attested under penalty of perjury that the contents of the motions or pleadings are true and correct." Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004). Therefore, the Court will also consider as evidence the factual assertions made in Plaintiff's complaint, which is verified.

///

///

7

### III.  STANDARD FOR SUMMARY JUDGEMENT

The Federal Rules of Civil Procedure provide for summary judgment or summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The standard for summary judgment and summary adjudication is the same.  See Fed. R. Civ. P. 56(a), 56(c); see also Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Under summary judgment practice, the moving party

> . . . always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Id., at 323 (quoting former Fed. R. Civ. P. 56(c)); see also Fed. R. Civ. P. 56(c)(1).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(c)(1); see also Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).  To demonstrate that an issue is genuine, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).  It is sufficient that "the claimed factual dispute be shown to require a trier of fact to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.

In resolving the summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  See Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Ultimately, "[b]efore the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251.

### IV.  DISUCSSION

Plaintiff alleges that Defendant violated his Eight Amendment right when he denied his request for a cane and mobility-impaired vest.  See ECF No. 1.  Defendant argues that he was not deliberately indifferent to Plaintiff's serious medical needs.  See ECF No. 44-2.  Defendant also argues he is entitled to qualified immunity.  See id.  The Court agrees that Defendant was not deliberately indifferent and thus recommends granting Defendant's motion.

The treatment a prisoner receives in prison and the conditions under which the prisoner is confined are subject to scrutiny under the Eighth Amendment, which prohibits cruel and unusual punishment.  See Helling v. McKinney, 509 U.S. 25, 31 (1993); Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The Eighth Amendment ". . . embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency."  Estelle v. Gamble, 429 U.S. 97, 102

1   (1976).  Conditions of confinement may, however, be harsh and restrictive.  See Rhodes v.

2   Chapman, 452 U.S. 337, 347 (1981).  Nonetheless, prison officials must provide prisoners with

3   "food, clothing, shelter, sanitation, medical care, and personal safety."  Toussaint v. McCarthy,

4   801 F.2d 1080, 1107 (9th Cir. 1986).  A prison official violates the Eighth Amendment only when

5   two requirements are met: (1) objectively, the official's act or omission must be so serious such

6   that it results in the denial of the minimal civilized measure of life's necessities; and

7   (2) subjectively, the prison official must have acted unnecessarily and wantonly for the purpose of

8   inflicting harm.  See Farmer, 511 U.S. at 834.  Thus, to violate the Eighth Amendment, a prison

9   official must have a "sufficiently culpable mind."  See id.

10              Deliberate indifference to a prisoner's serious illness or injury, or risks of serious

11  injury or illness, gives rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 105;

12  see also Farmer, 511 U.S. at 837.  An injury or illness is sufficiently serious if the failure to treat a

13  prisoner's condition could result in further significant injury or the ". . . unnecessary and wanton

14  infliction of pain."  McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992); see also Doty v.

15  Cnty. of Lassen, 37 F.3d 540, 546 (9th Cir. 1994).  Factors indicating seriousness are: (1) whether

16  a reasonable doctor would think that the condition is worthy of comment; (2) whether the

17  condition significantly impacts the prisoner's daily activities; and (3) whether the condition is

18  chronic and accompanied by substantial pain.  See Lopez v. Smith, 203 F.3d 1122, 1131-32 (9th

19  Cir. 2000) (en banc).

20              The requirement of deliberate indifference is less stringent in medical needs cases

21  than in other Eighth Amendment contexts because the responsibility to provide inmates with

22  medical care does not generally conflict with competing penological concerns.  See McGuckin,

23  974 F.2d at 1060.  Thus, deference need not be given to the judgment of prison officials as to

24  decisions concerning medical needs.  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir.

25  1989).  The complete denial of medical attention may constitute deliberate indifference.  See

26  Toussaint, 801 F.2d at 1111.  Delay in providing medical treatment, or interference with medical

27  treatment, may also constitute deliberate indifference.  See Lopez, 203 F.3d at 1131.  Where

28  delay is alleged, however, the prisoner must also demonstrate that the delay led to further injury.

1   See McGuckin, 974 F.2d at 1060.

2           Negligence in diagnosing or treating a medical condition does not, however, give

3   rise to a claim under the Eighth Amendment.  See Estelle, 429 U.S. at 106.  Moreover, a

4   difference of opinion between the prisoner and medical providers concerning the appropriate

5   course of treatment does not give rise to an Eighth Amendment claim.  See Jackson v. McIntosh,

6   90 F.3d 330, 332 (9th Cir. 1996).

7           In this case, Defendant acted as Plaintiff's primary care physician for

8   approximately for two months, from January 2019 to February 2019, and treated Plaintiff at least

9   four times.  ECF No. 44-5 at 2.  During his first visit, Plaintiff shared his medical history and

10  concerns with Defendant.  Id.  Plaintiff complained that he had fallen recently, causing him pain

11  in his whole body, especially his right knee.  Id. at 11.  Plaintiff also reported that he was

12  seriously injured in a motor vehicle accident in 1991.  Id.  During this visit, Defendant noted that

13  Plaintiff had a right knee brace, a back brace, and orthopedic shoes, but did not have a cane.  Id.

14  at 12.  Defendant also documented Plaintiff's request for a cane or wheelchair and to be placed on

15  Lyrica again.  Id. at 11.  When Defendant conducted a physical exam, he noted that Plaintiff's

16  right knee was slightly swollen, and that he had "excruciating tenderness with minimal touch on

17  lower back and several parts of the body."  Id. at 12-13.  During that visit, Defendant

18  recommended that Plaintiff have an MRI, and ordered him a right knee x-ray, lumbar spine x-ray,

19  pain cream, and temporary lower bunk housing.  Id.  Defendant found there was no medical need

20  for additional pain medication and did not order a cane or wheelchair.  Id. at 13-14.

21          At Plaintiff's second visit, he reported that his knee and back pain was not

22  improving and requested stronger pain medication.  Id. at 18.  Defendant noted in his assessment

23  of Plaintiff's right knee:

> CLINICAL INDICATION: right k[n]ee pain, fell, knee gave out
> COMPARISON: July 26, 2017.  TECHNIQUE: 3 views of the knee.
> FINDINGS: No acute fracture or dislocation.  No joint effusion.  Joint
> spacing appears normal.  Minimal patellar and medial compartment
> spurring is noted.  No destructive osseous lesion.  IMPRESSION: No
> acute findings.  (1) Findings of the knee x-ray explained to the patient.  I

28  / / /

11

> offered local steroid injection but patient does not want it and he will think about it.
>
> Id. at 19.

Defendant also noted in his assessment of Plaintiff's lower back:

> CLINICAL INDICATION: fell from bunk, back pain COMPARISON: October 13, 2018. TECHNIQUE: 7 views of the lumbar spine. FINDINGS: There is abnormal anterior height loss at T10 compatible with prior fracture. No lumbar fracture or subluxation. Mild degene[r]ative changes of the lumbar spine are present. Alignment is normal throughout flexion and extension. No destructive osseous lesions are seen. The visualized portions of the sacroiliac joints are unremarkable. IMPRESSION: AGE-INDETERMINATE T10 COMPRESSION FRACTURE. Continue current pain medication. Referred patient to physical therapy. Patient does not think physical therapy will help. But I explained to him why it is recommended.
>
> Id. at 20.

Defendant determined that Plaintiff's symptoms were suggestive of fibromyalgia and ordered Plaintiff Duloxetine and Lyrica. Id.

During Plaintiff's third visit, Plaintiff asked for an increased dose of Lyrica, which Defendant agreed to and ordered for Plaintiff. Id. at 22.

At Plaintiff's fourth and final visit, he told Defendant that he refused to go to physical therapy because he was in too much pain. Id. at 24. However, after discussing physical therapy with Defendant, Plaintiff agreed to try again. Id. at 25. Defendant also increased Plaintiff's Lyrica dosage. Id. Finally, Defendant noted that Plaintiff had a negative straight leg test and "walk[ed] without any assistance." Id. Additionally, Defendant stressed at least twice the importance of physical therapy. ECF No. 44-5 at 5-6. Defendant informed Plaintiff that physical therapy, and not simply relying on a cane, would regain and maintain long-term mobility for him. Id. Based on Plaintiff's ability to walk, his x-rays, and physical examinations, Defendant ultimately concluded that there was no medical need for Plaintiff to have a cane or wheelchair. Id. at 6.

///

///

///

Plaintiff relies upon his own declaration for evidence. ECF No. 57 at 8. He states that he believes he needs a cane and that another doctor gave him a cane in 2019. Id. Plaintiff notes that his injuries were exacerbated by Defendant's refusal to issue him a cane. Id. In addition, he says that Defendant should have ordered him an MRI because physical examinations and x-rays were inconclusive to determine if he actually needed a cane. Id. at 9.

As a threshold matter, Plaintiff's assertion that he actually needs a cane is not supported by competent evidence or qualified medical opinion. Indeed, the evidence provided by Plaintiff is his own opinion and conclusory statements, which cannot defeat Defendant's motion here. Taylor v. List, 880 F.2d 1040, 1045 ("A summary judgment motion cannot be defeated by relying solely on conclusory allegations unsupported by factual data."). Further, Defendant's treatment does not rise to the level of deliberate indifference simply because Plaintiff or another doctor has a difference of opinion. "A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (1989)). Moreover, Plaintiff is not a qualified medical expert able to provide competent testimony regarding the sufficiency of medical care. See Fed. R. Evid. 702; Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). Accordingly, Plaintiff's personal assertions that he needs a cane do not rise to the level of deliberate indifference to serious medical needs. In addition, Defendant's evidence demonstrates that he provided Plaintiff with adequate medical care.

Turning to Plaintiff's claim that Defendant denied him a mobility-impaired vest, Defendant does not recall Plaintiff requesting such a vest. ECF No. 57 at 7. Defendant also notes that a mobility-impaired vest is not a treatment – it is merely a tool to put correctional staff on notice that an inmate cannot obey a "get down" order. Id. Defendant further indicates that Plaintiff requested a mobility-impaired vest from another doctor in April 2019, but that the doctor declined to order it for Plaintiff. Id. However, yet another doctor ordered Plaintiff a mobility-impaired vest in 2021. Id.

///

Plaintiff's claim regarding a mobility-impaired vest fails as a threshold matter because he never alleged that he was injured, or an existing injury worsened because he did not have a mobility-impaired vest. Plaintiff alleges in that he needed a mobility-impaired vest to "accommodate" him. Id. at 8. The record does not indicate that Defendant sought to intentionally inflict harm on Plaintiff or that Defendant was deliberately indifferent to Plaintiff's medical needs by denying him a mobility-impaired vest.

The Court finds that, despite Plaintiff's assertion that a genuine issue of material fact exists as to whether Defendant was deliberately indifferent to his serious medical needs, in light of the undisputed evidence showing that Defendant consistently provided Plaintiff with treatment for his complaints, Plaintiff, at most, has raised a difference of opinion regarding his medical treatment, and a "difference of opinion does not amount to a deliberate inference to [plaintiff's] serious medical needs." Sanchez, 891 F.2d at 242.

## V.  CONCLUSION

Based on the foregoing, the undersigned recommends that Defendant's motion for summary judgment, ECF No. 44, be granted. Given the absence of a triable issue on the Plaintiff's deliberate indifference claim, the Defendant's assertion of qualified immunity does not bear evaluation here.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within 14 days after being served with these findings and recommendations, any party may file written objections with the court.  Responses to the objections shall be filed within 14 days after service of objections.  Failure to file objections within the specified time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  November 9, 2021

DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE